By the Court.
The first question presented in this case is the following: Is the right of referendum reserved by the constitution upon an act which the general assembly has adopted, the general assembly having passed a separate emergency section, wherein the reasons for such necessity have been set forth, by a vote of two-thirds of all the members elected to each branch upon a yea and nay vote upon separate roll call ? No case has previously been presented to this court involving that question.
Section Id, Article II of our Constitution, is as follows: “Laws providing for tax levies, appropriations for the current expenses of the state government and state institutions, and emergency laws necessary for the immediate preservation of the public peace, health or safety, shall go into immediate effect. Such emergency laws upon a yea and nay vote must receive the vote of two-thirds of all the members elected to each branch of the general assembly, and the reasons for such necessity shall be set forth in one section of the law, which section shall be passed only upon a yea and nay vote, upon a separate roll call thereon. The laws mentioned *595 in this section shall not be subject to the referendum.”
In approaching the consideration of this question this court must be mindful of the cardinal rule long adhered to, that “it is only when manifest assumption of authority and clear incompatibility between the constitution and the law appear, that the judicial power will refuse to execute it.” Cincinnati, Wilmington & Zanesville Rd. Co. v. Commissioners of Clinton County, 1 Ohio St., 77.
Mindful of the principles- announced in the above case and others later cited in this opinion, two judges of this court are convinced that an examination of the constitution clearly indicates that the provisions of Section lei of that instrument, in a case of this character, preclude a referendum when the act and the emergency clause have been adopted in the manner stated, by a two-thirds vote in each branch of the general assembly. The Constitutional Convention did not vest the courts with power over questions of legislative policy. There is nothing in the debates or in the proceedings of the Constitutional Convention indicating any purpose or design of the framers of the amendment in question that every act passed as an emergency law should be submitted to the test of judicial scrutiny by proceeding in court, and the reasons assigned by the legislature for the necessity of the law becoming immediately effective be subject to the approval of the courts of the state. Indeed, the attitude and the action of the convention would indicate quite the contrary purpose and design.
*596 Section id, aforesaid, provides that emergency laws shall go into immediate effect, and in order to emphasize that fact the constitutional provision closes with this language: “The laws mentioned in this section [which include emergency laws] shall not be subject to the referendum” The balance of the section merely characterizes an emergency law. Such law, as distinguished from an ordinary law, requires the vote of two-thirds of all the members elected to each branch of the general assembly. In addition, it is required that the reasons for such necessity shall be set forth in one section, and that section shall be passed only upon a yea and nay vote upon a separate roll call. The history of this section, its discussion, the form in which it was adopted and presented to the people of this state for approval when the constitution was adopted, all support the view that the makers of the constitution had confided to the two-thirds of each branch of the general assembly the function of ascertaining and recording reasons which to them appeared to be necessary .to give the law immediate effect. In the constitutional convention were men of all shades of opinion, and the discussion of the initiative and referendum proposition submitted ended in a compromise between the factions. There were those who urged that every act passed by the general assembly should be subject to the referendum. However, it was finally determined that all acts of the general assembly should not be subject to the referendum, and that those excepted therefrom should “go into immediate effect.”
*597 The manner and form in which this particular provision of the constitution was adopted make it clear that the question of preservation of the public peace, health or safety, together with the reasons for the necessity of passing such emergency law, were confided to the legislative discretion with the requirement that such laws should receive a two-thirds vote of all members elected to each branch. This is made clear by the adoption of this provision of the constitution in the following form, as shown on page 943 of the Debates of the Ohio Constitutional Convention, wherein Section Id contained the following language: “Emergency measures necessary for the immediate preservation of the public peace, health and safety, if such emergency measures upon a yea and nay vote shall receive the vote of two-thirds of the members elected to each branch of the general assembly, shall go into immediate effect.” The wording of the provision was later changed by the committee on phraseology, but there was no amendment offered or discussion had which would indicate an intention to alter the construction which the constitution-makers had theretofore placed upon it.
The opponents of this view have trained their heaviest guns upon the phrase, “reasons for such necessity,” found in the provision, which they say dominates the section and controls the positive and emphatic language otherwise provided therein, whereby emergency laws are not made subject to referendum. That the constitution-makers had no such view would seem to appear from, the fact that when this feature was submitted in the official ad *598 dress to the people, signed by Herbert S. Bigelow, as president of the convention, and C. B. Gal-breath, as secretary, it contained the following explanation: “That laws providing for tax levies, appropriations for the current expenses of the state government and institutions and emergency laws' necessary for the immediate preservation of the public peace, health or safety shall go into effect immediately if they receive a two-thirds vote of the members elected to the general assembly.” It does not appear that the reasons, so long as they were satisfactory to two-thirds of all the members elected to each branch, were all-controlling, for the explanation does not refer to them. This explanation clearly provided that emergency laws, etc., “shall go into effect immediately if they receive a two-thirds vote of all the members elected to the general assembly.” It is but fair to assume that such official announcement of the purpose and effect of this amendment was a correct statement thereof and that the people accepted the explanation thus announced and published and that their approval was based thereon.
It would seem, therefore, that these features of the law are justiciable: (a) That emergency laws must receive a two-thirds vote of all the members elected to each branch, (b) Reasons for the necessity shall be set forth in one section of the law. (c) That such emergency section shall be passed upon a yea and nay vote upon a separate roll call.
Manifestly, this court cannot go outside of the provisions of the act and the facts which it judicially knows for the purpose of ascertaining *599 whether the legislature had valid reasons for declaring this to be an emergency law. Primarily this is a legislative and not a judicial policy, and the subject-matter comes naturally within the legislative and not the judicial field. We should hesitate to determine judicially that the lawmakers of the state had violated their oaths by making a false statement in their declaration of emergency.
We are supported in this view by the decision of courts in sister states which have adopted referendum provisions similar to those in Ohio, as will be seen by the following cases: Kadderly v. Portland, 44 Ore., 118; Hanson v. Hodges, 109 Ark., 479; State, ex rel. Lavin, v. Bacon, 14 S. D., 394 (1901); Oklahoma City v. Shields, 22 Okla., 265 (1908); and VanKleeck v. Ramer, Secretary of State, 62 Colo., 4 (1916).
It is true the courts in certain jurisdictions have held otherwise, but we attach great importance to the ' cases cited, especially to that of Kadderly v. Portland, supra, decided in 1903, by the supreme court of Oregon, for the reason that the report of debates of the Ohio Constitutional Convention shows clearly that the Ohio referendum provision was copied from the Oregon Constitution, and the debates of the Ohio convention disclose that the decision of the highest court of Oregon upon the initiative and referendum was fully considered by the Ohio Constitutional Convention, for at that time the supreme court of Oregon in the Kadderly case, supra, had decided this feature of its referendum provision by the following clause of the syllabus: “The question whether a given law is necessary for the im *600 mediate preservation of the public peace, health or safety, and thus one that may be put into operation at once by adding to it an emergency clause, is distinctly for the legislature, and its action in the matter is not judicially reviewable.”
This act, upon a yea and nay vote, having received the votes of two-thirds of all the members elected to each branch of the general assembly, the reasons for the immediate necessity for such law having been set forth in one section of the law which was passed upon a yea and nay vote upon a separate roll call, it is held by Judges Jones and Matthias that all the provisions of Section Id of Article II of the Ohio Constitution were thereby complied with, and that under its clear and express terms an act so passed is not “subject to the referendum” and “shall go into immediate effect.” Under the provisions of Section 2, Article IV of the Constitution, providing that “no law shall be held unconstitutional and void by the supreme court without a concurrence of at least all but one of the judges” the conclusion above announced would require a denial of the writ of mandamus prayed for.
However, if it be conceded that the validity of the reasons stated is a justiciable question and that the court may inquire whether such reasons bear a reasonable relation to the public peace, health and safety, Judges Jones and Matthias join Judges Hough and Robinson in the following reasons and conclusion: In the case of Cass v. Dillon, 2 Ohio St., 607, it was held: “The repugnancy which must cause the law to fall, must be necessary and obvious; if by any fair course of reasoning, the law *601 and the constitution can be reconciled, the law must stand.”
In the recent case of City of Xenia v. Schmidt, 101 Ohio St., 437, this court declared: “1. A legislative act is presumed in law to be within the constitutional power of the body making it, whether that body be a municipal or a state legislative body.
2. That presumption of validity of such legislative enactment cannot be overcome unless it appear that there is a clear conflict between the legislation in question and some particular provision or provisions of the constitution.” In the opinion by Wanamaker, J., at page 443, the opinion of John Marshall, C. J., in the case of Fletcher v. Peck, 6 Cranch, 87, decided in 1810, is quoted with approval as follows: “The question, whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the. constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other.”
And in City of Xenia v. Schmidt, at page 444, Judge Wanamaker again quotes from the opinion of Justice Washington in the case of Ogden v. *602 Saunders, 12 Wheat., 213 (1827), as follows: “If I could rest my opinion in favor of the constitutionality of the law * * * on no other ground than this doubt so felt and acknowledged, that alone would, in my estimation, be a satisfactory vindication of it. It is but a decent respect due to the wisdom, the integrity, and the patriotism of the legislative body by which any law is passed, to presume in favor of its validity, until its violation of the constitution is proved beyond a reasonable doubt. This has always been the language of this court, when that subject has called for its decision; and I know that it expresses the honest sentiments of each and every member of this bench.”
Quoting again from the opinion of Chief Justice Waite in Sinking-Fund Cases, 99 U. S., 700 (1878): “Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions; depends in no small degree on a strict observance of this salutary rule.”
Also quoting from the opinion of Chief Justice Shaw in the case of Wellington et al., Petitioners, 16 Pick., 87: “To repeat what has been so often suggested by courts of justice, that when called upon to pronounce the invalidity of an act of legislation * * * [they will] never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt.”
Quoting again from the opinion of Justice *603 Ranney in the case of Cincinnati, Wilmington & Zanesville Rd. Co. v. Clinton County Commissioners, 1 Ohio St., 77, the learned Judge in the Xenia case, at page 445, approved this language: “But while the right and duty of interference in a proper case, are thus undeniably clear, the principles by which a court should be guided, in such an inquiry, are equally clear, both upon principle and authority * .* * and it is only when manifest assumption of authority, and clear incompatibility between the constitution and the law appear, that the judicial power can refuse to execute it. Such interference can never be permitted in a doubtful case. And this results from the very nature of the question involved in the inquiry. * * *
“The adjudicated cases speak a uniform language upon this subject. * * *
“An unbroken chain of decisions to the same effect, is to be found in the State Courts.”
This same principle was approved and applied in the recent case of Pohl v. State, ante, 474, in which all members of this court concurred. It is there stated that “If under any possible state of facts the sections [of the law] would be constitutional, this court is bound to presume that such facts exist.” v
The Constitution of 1912 recognized the power reposed in the judiciary of declaring laws to be unconstitutional and void. And in order to maintain legislative supremacy, and to curb the judicial power, this provision (Section 2, Article IV) was adopted as a part of the Judicial Article:
“No law shall be held unconstitutional and void *604 by the supreme court without the concurrence of at least all but one of the judges.”
Adhering to the principle adopted and so fre-. quently applied, not only by our own court but by substantially every court in the country, it follows that where the legislative authority has once acted for reasons obvious or satisfactory to itself, the judicial department is not permitted to review the wisdom of legislative policies or to review legislative discretion. The court may intervene only when it is convinced that the legislative act is incompatible with the provisions of the constitution. The' majority of this court are of opinion that such is not the case here.
Having in mind the principles enunciated by Chief Justice John Marshall, Justice Washington, Chief Justice Waite and Chief Justice Shaw, quoted above, and remembering the admonition of Ranney, C. J., in Hill v. Higdon, 5 Ohio St., 243, that “We can not overturn in doubt, what they [the general assembly] have established in settled conviction,” and resolving every rational presumption in favor of the constitutionality of the provision and of the existence of the conditions and state of facts found by the legislature to exist, we are unable to say that the public peace and safety will not be preserved by the legislation in question and that there is no necessity for the law going into immediate operation.
Section 5 recites: “According to the annual reports of the auditor of state, the balances subject to draft in the general revenue fund of the state, from which many of our activities of the state gov *605 ernment are supported, had shrunk from more than two million dollars on June 30th, 1919, to' less than one million dollars on June 30th, 1920, (all of which, and more, was covered by unlapsed appropriations for the preceding fiscal year), clearly indicating the immediate necessity either for increasing the revenues of the state, or for effecting such a reorganization of the state administration as would tend to conserve the present revenues. General economic conditions make increased taxes highly undesirable at the present time. * * *
“As a result of all the foregoing, the state service in the appointive state departments, shown by said investigations to be wasteful and inefficient, is becoming increasingly demoralized. * * * The necessity of placing their functions upon a sound, economical, permanent and secure basis is great and immediate.”
The reasons assigned show a fiscal condition in our state which demands immediate relief. These impute the bankruptcy of the state if the present condition of affairs is allowed to exist. A shrinking of more than one million dollars in a single year in the general revenue fund of the state would seem to demand some immediate remedy for the peace and safety of the state; for a bankrupt state, or a grossly overtaxed state, is on the threshold of dissolution and becomes a fertile field for communism, bolshevism and anarchy. We have but to look to our neighbors to the south or across the seas for a verification of this assertion. If this act results, as the legislature declares it will, in saving to the state its diminishing revenues, without fur *606 ther taxation, such an end would be not only a consummation devoutly to be wished, but would tend toward the preservation of the public peace and safety, and would be such an emergency law as was contemplated by the members of the constitutional convention in the enactment of Section Id of Article II.
Indulging the presumption in favor of the legislation, and in the absence of positive, judicial knowledge to the contrary, this court is bound to accept as true the reasons assigned by the legislature for making the act in question an emergency law.
It follows that the motion of the respondent for a judgment upon the pleadings should be sustained, the writ denied, and the petition of the relator dismissed.

Writ denied.

Hough, Robinson, Jones and Matthias, JJ., concur.